UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
HALINA WOJCIK,

        Plaintiff,        **MEMORANDUM AND ORDER**

  -against-                10-CV-1579 (KAM)(VVP)

ALMA L. BRANDISS, CECILIA
CELESTINO, NEW YORK CITY HHC/
BELLEVUE HOSPITAL CENTER,

        Defendants.
------------------------------X

**MATSUMOTO, United States District Judge:**

      Plaintiff Halina Wojcik ("Plaintiff") is a dietician

who was formerly employed by defendant New York City Health and

Hospitals Corporation ("HHC") at the Bellevue Hospital Center

("Bellevue") Special Supplemental Nutrition Program for Women,

Infants, and Children ("WIC Program"). (*See generally* ECF. No.

18, Second Amended Complaint ("Am. Compl.").)  Plaintiff brings

this action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985; Title

VII of the Civil Rights Act of 1964 ("Title VII"); Title VI of

the Civil Rights Act of 1964 ("Title VI"); New York Executive

Law § 296 ("NYSHRL"); and New York City Administrative Code § 8-

107(1) ("NYCHRL"), alleging that her employment with HHC was

unlawfully terminated on the basis of her national origin

(Polish) and race (Caucasian), and in retaliation for her

complaints about unlawful discrimination by individual

defendants Alma L. Brandiss ("Brandiss") and Cecilia Celestino

("Celestino") (together with HHC, "Defendants").[1] (*See generally*
*id.*)

Presently before the court is Defendants' motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56,

in which Defendants seek the dismissal of all of Plaintiff's

remaining claims. (*See* ECF No. 45, Notice of Mot. for Summ. J.)

Plaintiff opposes the motion. (*See generally* ECF No. 51, Mem.

of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp.").) For

the reasons set forth below, Defendants' motion for summary

judgment is granted in its entirety and Plaintiff's claims are

dismissed.

## BACKGROUND[2]

### I.  Plaintiff's Position with the Bellevue WIC Program

The WIC Program is administered by the New York State

Department of Health ("DOH") and is subject to federal

---

[1] Additional claims asserting age discrimination (Second and
partial Third and Seventh Causes of Action), *Monell* claims against HHC (First
and Sixth Causes of Action), and hostile work environment (Partial First,
Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action) were
previously dismissed by Plaintiff with prejudice on July 2, 2012. (ECF No.
38, Stip. and Order of Partial Dismissal.)

[2] The following facts, taken from the parties' statements pursuant
to Local Civil Rule 56.1 and the admissible evidence contained in the
exhibits cited and annexed to the parties' motion papers, are undisputed
unless otherwise indicated. Insofar as this court relies on facts set forth
in Defendants' Rule 56.1 Statement, it has done so because Plaintiff has
either admitted such facts or has not disputed the facts with citations to
admissible evidence. *See Giannullo v. City of New York,* 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so
set forth in the moving party's Rule 56.1 statement, that fact will be deemed
admitted."). Where Plaintiff presents an evidentiary basis for disagreeing
with Defendants' characterizations of the cited evidence, the court relies on
Plaintiff's characterization of the evidence. *Cifra v. Gen. Elec. Co.*, 252
F.3d 205, 216 (2d Cir. 2001) (noting court must draw all rational factual
inferences in non-movant's favor in deciding summary judgment motion).

regulations.  (ECF No. 46, Defs.' Local Rule 56.1 Statement of

Undisputed Material Facts ("Defs.' 56.1") ¶¶ 2-3.)  The WIC

Program offers nutrition education, breastfeeding support,

referrals, and nutritious foods to low-income pregnant,

breastfeeding or postpartum women, infants, and children.  (*Id.*

¶ 2.)

One aspect of the WIC Program is providing clients

with checks to be used to purchase infant formula.  (*Id.* ¶ 4.)

These checks were available to any qualifying mother with an

infant.  (ECF No. 52, Pl.'s Response to Defs.' 56.1 ("Pl.'s

56.1") ¶ 5.)  Section 1330-B of the New York State DOH WIC

Program Manual (the "Program Manual") governs the policy and

procedures when clients report lost or stolen checks.  (Defs.'

56.1 ¶ 6.)[3]  Section 1330-B provides that lost or stolen checks

may be replaced only when (1) checks that have been reported as

lost or stolen by a client or their proxy are subsequently found

and returned to WIC, or (2) checks that have been printed for a

participant or their proxy are misplaced due to a WIC agency or

system error prior to issuance.  (*Id.* ¶ 7.)  Food packages

covered by the replacement checks must "be identical to the food

_____

[3] Plaintiff contests Defendants' Rule 56.1 Statement on this point
on the basis that "[a] significant portion of the Section which is helpful to
the plaintiff, has been omitted from Defendants [sic] Exhibit[s]."  (Pl.'s
56.1 ¶ 6.)  Plaintiff fails, however, to identify any specific disputes or
other portions of the Program Manual regarding lost or stolen checks.
Furthermore, Plaintiff's complaint about the completeness of Section 1330-B
in the record is alleviated by Plaintiff's inclusion of the full section in
her own motion papers.  (*See* ECF No. 54, Decl. of Brian McCaffrey, Esq. in
Opp. to Summ. J. ("McCaffrey Decl.") Ex. 6.)

packages contained on the original checks and no changes to the food package can occur during the check issuance cycle." (Pl.'s 56.1 ¶ 8.) Additionally, pursuant to Section 1320 of the Program Manual, so-called "manual checks" may be issued only under certain circumstances not including instances of lost or stolen checks, and expressly may not be issued for, *inter alia*, "food package changes." (ECF No. 47, Decl. of Jane E. Andersen in Supp. of Summ. J. ("Andersen Decl.") Ex. E, at OLR000170.)

Plaintiff, who is of Polish national origin, began working at Bellevue's WIC Program following an internship at the program in December of 1997 as a Staff Dietician, Dietician Level I. (Defs.' 56.1 ¶¶ 11-12.) Plaintiff was interviewed and hired by Brandiss. (*Id.* ¶ 13.) Brandiss was, at all relevant times, the director of the Bellevue WIC Program, and Celestino was Plaintiff's immediate supervisor at Bellevue. (*Id.* ¶ 10.) Brandiss and Celestino are of Philippine national origin. (*Id.* ¶ 9.)

As a staff dietician, Plaintiff's job responsibilities included providing nutritional counseling to WIC clients. (*Id.* ¶ 14.) After approximately ten months, Plaintiff was promoted to the title of Head Dietician, Dietician Level II, in which position she was responsible for assisting high-risk clients, and quality assurance in addition to counseling clients. As a staff dietician, Plaintiff's job responsibilities included

providing nutritional counseling to WIC clients.  (*Id.* ¶¶ 15-16.)

In or around April of 2001, Plaintiff was promoted to the title of Associate Supervising Dietician, Dietician Level III, which included an increased salary.  (*Id.* ¶ 17.)  Plaintiff was made Associate Supervising Dietician after Celestino informed Plaintiff that she was planning to resign and asked if Plaintiff would consider the title and additional responsibility.  (*Id.* ¶ 20.)  Although Celestino did not in fact resign, Brandiss asked Plaintiff to take some of Celestino's administrative responsibilities.  (*Id.* ¶ 21.)  At all relevant times, Plaintiff was the only Associate Supervising Dietician, Dietician Level III, employed at the Bellevue WIC Program and there were no Level IV Dieticians.  (*Id.* ¶ 18.)

In or around 2006, Brandiss wanted Plaintiff to work closely with her at the main Bellevue site because she was considering Plaintiff for a possible promotion in the event that Celestino retired.[4]  (*See id.* ¶¶ 25-26.)

## II.  **Plaintiff's Termination and Administrative Appeals**

On August 11, 2008, a new mother came to the WIC Program and was issued two months' worth of checks for formula, which were valid for five cans of formula per month for two

---

[4] Plaintiff "dispute[s] the sincerity of th[is] statement" by Brandiss, but nonetheless agrees that the statement was made by Brandiss. (Pl.'s 56.1 ¶ 26.)

months for a total of ten cans. (*See id.* ¶ 27; Pl.'s 56.1 ¶ 27.) WIC clients are allowed a maximum of nine cans of formula per month. (Pl.'s 56.1 ¶ 31.) On August 12, 2008, the mother returned to the WIC Program and reported that she had lost the checks. (Defs.' 56.1 ¶ 28.) The mother was first referred to a Peer Counselor to counsel the mother to breastfeed and to issue the mother an electronic breast pump. (*Id.* ¶ 29.) Plaintiff then informed the Peer Counselor that she would meet with the mother. (*Id.* ¶ 30.)[5] Thereafter, Plaintiff wrote a note directing non-party nutritionist Hedyln David-Bismonte ("Bismonte") to issue the mother two manual checks for four cans of formula, but Bismonte did not do so. (*Id.* ¶¶ 31, 33.) Plaintiff then issued the mother the manual checks herself and entered the following note in the client's WIC Program electronic file: "Two months of manual checks were issued today to increase food package. First month: 4 cans of Enfamil Lipli Powder formula was issued with NGB date of 8/11/08. Second month, the same amount of formula was issued with NGB date of 9/11/08." (*Id.* ¶ 34.)

---

[5] Plaintiff claims that a memorandum cited to by Defendants in their Rule 56.1 Statement for this fact "contains many factual errors;" however, Plaintiff again fails to identify what these alleged errors are, and agrees that Plaintiff told the Peer Counselor that she would meet with the mother. (*See id.* ¶ 30.)

This incident was subsequently brought to the attention of Brandiss, who investigated the matter and found in an August 17, 2008, memorandum to Plaintiff that:

> Your decision to increase food package as indicated in your notes . . . violates [WIC] policy. You further perpetuated this violation by not indicating in your notes the fact that the checks were lost, apparently to justify your decision to increase the food package the day after they were issued. This constitutes false documentation and compromises program integrity.

(*Id.* ¶ 35 (quoting Andersen Decl. Ex. G, at OLR000174).)[6] Brandiss then referred the matter to HHC's Director of Labor Relations. (*Id.* ¶ 36.) By letter dated August 20, 2008, Plaintiff was suspended without pay from her duties as a Dietician Level III and a Notice and Statement of Charges were served upon her. (*Id.* ¶ 37.) Plaintiff was charged with gross misconduct. (*Id.* ¶ 38.)

On September 26, 2008, a Step IA Informal Conference was held at the HHC Office of Labor Relations, at which Plaintiff was represented by her 1199 Union Delegate, Lorna Armesto ("Armesto"). (*Id.*) At the conference, the following

---

[6] Plaintiff contests the factual accuracy of Brandiss's memo, but does not identify the errors or offer contrary admissible evidence. Plaintiff further claims that she did not receive the August 17 Brandiss memo until the third step of her eventual grievance hearing in April of 2009, discussed *infra*. (*See id.* ¶ 35.) Plaintiff does not, however, dispute that Brandiss did in fact draft this memo to Plaintiff regarding the August 12th client incident on August 17, 2008. (*See id.*)

eight "specifications" were addressed regarding Plaintiff's

purported gross misconduct on August 12, 2008:

1.   [Plaintiff] engaged in a verbal
     altercation with another employee.
2.   [Plaintiff] spoke to another employee
     in an unprofessional manner.
3.   [Plaintiff] violated the New York State
     Department of Health WIC Program
     Manual, Section 1330-B, which prohibits
     the replacement of lost checks
4.   [Plaintiff] violated the New York State
     Department of Health WIC Program
     Manual, Section 1227-C, which contains
     "Guidelines for issuing, Breast Pumps."
5.   [Plaintiff] exceeded [her] authority by
     issuing a replacement check without
     authorization.
6.   [Plaintiff] exceeded [her] authority by
     increasing a food package without
     authorization.
7.   [Plaintiff] failed to document in [her]
     case notations that a patient check had
     been lost or replaced. These omissions
     constitute falsification.
8.   [Plaintiff] exceeded [her] authority by
     failing to consult with a superior
     before issuing a replacement check.

(*Id.*) The Step 1A Labor Relations Officer's subsequent October

3, 2008, decision recommended that Plaintiff's employment with

HHC be terminated. (*Id.* ¶ 40.) The Labor Relations Officer

specifically found that specifications three through eight "were

acknowledged by guilt with an explanation of no malicious intent

on the part of [Plaintiff], who was merely attempting to help

the patient. [Plaintiff] admitted she was determined to

increase the food package even if it meant going against policy

and procedure. . . . [Plaintiff's] explanation for failing to

document even though she knew the policy and procedure were being violated had no merit." (*Id.* ¶ 39 (quoting Step 1A Decision, Andersen Decl. Ex. J, at OLR000141).) The Labor Relations Officer further found that the client mother "did not redeem the checks until September 24, 2008 almost six weeks after they were issued August 11,[7] 2008. A clear indication that [Plaintiff] was so busy breaking procedure that she failed to realize the patient was not being honest and the situation was not as serious as she imagined." (*Id.*)

On December 8, 2008, a Step II grievance appeal hearing was held, in which Plaintiff was again joined by union representative Armesto and a union organizer. (*Id.* ¶ 41.) Following a review of the same eight specifications that were at issue in the prior hearing, the Step II Review Officer determined in a January 7, 2009, decision that:

> Policy #1330-B is clear that lost or stolen checks cannot be replaced unless they are found and returned to the agency or are misplaced due to agency error prior to issuance. No one at the WIC program can override this clear policy. [Plaintiff's] claim that she did not replace lost checks and merely increased the mother's package is completely at odds with the facts. . . . I find that [Plaintiff] deliberately chose to ignore the mandates of Policy #1330-B and replaced the checks in the guise of increasing the package. I also find that [Plaintiff] deliberately falsified the electronic record by not noting that checks

---

[7] It is unclear whether the mother redeemed the checks she previously claimed had been lost or the replacement checks.

> were lost or stolen. . . . [Plaintiff's]
> actions place the program in jeopardy
> because strict governmental guidelines are
> required to be followed and the program is
> subject to audit. Also, [Plaintiff's]
> actions increase the likelihood that
> participants will sell checks on the black
> market.

(*Id.* ¶ 42 (quoting Step II Decision, Andersen Decl. Ex. K, at OLR000161).)

On April 22, 2009, a Step III conference was held before the City of New York Office of Labor Relations. (*Id.* ¶ 43.) On May 29, 2009, the presiding Review Officer upheld the decision to terminate Plaintiff. (*Id.*)

Plaintiff and her union then challenged Plaintiff's termination before a neutral arbitrator, who presided over hearings on January 13, 2010, March 12, 2010, and April 9, 2010. (*Id.* ¶ 44.) At the arbitration hearings, Plaintiff was represented by her current counsel, and argued that she had not replaced lost checks on August 12, 2008, but, rather, had increased the overall food package for the mother's child. (*Id.* ¶¶ 45, 47.) Conversely, HHC argued that termination was an appropriate penalty against Plaintiff because her actions "could have seriously compromised the WIC Program at Bellevue and . . . result[ed] in an abuse of trust so serious as to warrant discharge," and because Plaintiff "continues to deny any wrongdoing." (*Id.* ¶ 48 (citation and internal quotation marks

omitted).)  In an August 3, 2010, decision, the neutral

arbitrator held, in part:

> [Plaintiff] is not credible.  While it is
> clear that [the mother] could have
> been issued checks for 9 cans on August 11, she
> was issued checks for 5 cans.  Even in the
> worst case of her not being able to
> breastfeed at all, those cans should have
> and could have clearly lasted for at least
> one month, if used exclusively.  The
> testimony regarding this fact is unrebutted.
> . . .
>
> [DOH] regulations clearly state that checks
> may not be issued to replace lost or stolen
> checks.  Additionally, manual checks may
> only be issued for specific reasons, which
> reasons do not include replacement of lost
> or stolen checks or the increase in a
> package from a partial package to a full
> package. . . .
>
> What is most troubling is that,
> notwithstanding the Union's assertion that
> [Plaintiff] took responsibility for her
> error in [the mother's electronic file], I
> do not find that [Plaintiff] took
> responsibility for anything else. . . . [I]n
> a case like this, where the employer has
> lost trust in an employee and her ability to
> carry out its mission and its obligations
> under the law, then it is impossible to ask
> the employer to take the employee back.

(*Id.* ¶ 49 (quoting Arbitration Decision, Andersen Decl. Ex. M,

at OLR000131-33).)

## III. Plaintiff's Discrimination Allegations

Plaintiff alleges that Celestino, Brandiss, and non-

party Bismonte discriminated against her.  (*Id.* ¶ 50.)

Plaintiff specifically alleges that Celestino discriminated

against her insofar as Plaintiff was "treated completely different from other people in the department by Ms. Celestino. She was yelling at me, screaming at me, basically publically humiliated me in front of other workers, in front of clients and in front of Bellevue Hospital employees." (*Id.* ¶ 51 (quoting Pl.'s Dep. at 58, Andersen Decl. Ex. B).) Plaintiff claims that Celestino told her that "she cannot listen to me, she cannot stand it when I talk, my accent bothered her so much." (Pl.'s Dep. at 59.) Plaintiff also claims that Celestino told her that Plaintiff "cannot speak on the phone and [she] cannot speak in Polish even when [Plaintiff] was speaking to Russian clients and some Russian clients were calling [her]." (Pl.'s Dep. at 60.) According to Plaintiff, Celestino would correct Plaintiff's English "once in awhile" in front of other people and it was clear to Plaintiff that "obviously my pronunciation bothered her." (Pl.'s Dep. at 67.)

According to Plaintiff, sometime in 2007 she questioned Brandiss about whether there was a change in policy concerning electronic breast pumps, to which Brandiss responded by stating "you think you're better because you're Polish, you think you're better because they're Spanish, you think you're better because you have a Master's degree." (Pl.'s Dep. at 73-74.)

Sometime in 2001, Plaintiff asked Celestino and Brandiss with regard to Plaintiff's belief that she was being treated differently than other employees, "do I have to go through all of this because I'm Polish[?]" (Pl.'s Dep. at 114.) Sometime during the beginning of her employment at the WIC Program, and at any other time she noticed it, Plaintiff also complained about Polish clients having to wait longer than other clients. (Def.s' 56.1 ¶ 61.) Additionally, on or about January 31, 2008, and February 19, 2008, Plaintiff wrote to Brandiss complaining about the supervision of Celestino. (*Id.* ¶ 62.)

Plaintiff believes that disciplinary charges were brought against her because of discrimination on the part of Brandiss, Celestino, and Bismonte. (*See* Defs.' 56.1 ¶¶ 57-58.) Celestino, though not personally involved in the August 12, 2008, incident, was Plaintiff's direct supervisor and did attend and help to prepare evidence for Plaintiff's Step 1A hearing. (*See id.* ¶¶ 10, 59; Pl.'s 56.1 ¶ 59.)[8]

---

[8] In addition to the preceding undisputed material facts, Plaintiff provides five additional facts which she claims are undisputed and which, for the reasons discussed *infra*, relate to impermissible or insufficiently substantiated arguments in opposition to summary judgment. (*See id.* ¶¶ 63-67.)

**DISCUSSION**

**I.    Standard of Review**

    **A.    Summary Judgment Standard**

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A fact is material if it might affect the outcome of the suit under the governing law."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (citing *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* (citing *Roe,* 542 F.3d at 35).  Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

14

The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The court must construe the facts in the light most favorable to the nonmoving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Id.* Nevertheless, the nonmoving party may not rest merely on allegations or denials but must instead set forth specific facts showing a genuine issue for trial. *See id.* ("To defeat a summary judgment motion, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (citations omitted). Such facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

### B. Title VII Employment Discrimination Claims

Pursuant to Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). The

court analyzes Title VII discrimination claims under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *See, e.g.*, *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010) (assessing plaintiff's Title VII claims for race and national origin discrimination under the framework set forth in *McDonnell Douglas*). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination. *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008); *Ruiz*, 609 F.3d at 491-92. The burden of establishing a *prima facie* case is not onerous. *Tex. Dep't of Comt'y Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Indeed, the Second Circuit has characterized the burden as "minimal." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir. 2000).

If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to offer a "legitimate non-discriminatory reason" for the termination. *Ruiz*, 609 F.3d at 492 (citing *Holcomb*, 521 F.3d at 140). This "burden is one of production, not persuasion . . . and involves no credibility assessment of the evidence." *Pathare v. Klein*, No. 06-CV-2202,

2008 U.S. Dist. LEXIS 69119, at *12 (S.D.N.Y. Sept. 12, 2008) (citations omitted), *aff'd*, 347 F. App'x 646 (2d Cir. Sept. 30, 2009).

If the defendant satisfies its burden, the plaintiff must present evidence to demonstrate that the defendant's asserted reason is mere pretext for an impermissible discriminatory motive. *Holcomb*, 521 F.3d at 141. In the summary judgment context, this means that the plaintiff must "establish a genuine issue of material fact either through direct, statistical, or circumstantial evidence as to whether the employer's reason for discharging [the plaintiff] is false *and* as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225 (2d Cir. 1994) (emphasis in original).

The Second Circuit has cautioned that summary judgment is often inappropriate in cases where the trier of fact will have to delve into an employer's intent because intent is an issue as to which direct evidence is rarely available. *See, e.g.*, *id.* at 1224; *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010). Nevertheless, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. *See, e.g.*, *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.

1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

## C.  NYSHRL and NYCHRL Discrimination Claims

New York State's human rights laws "are in accord with the federal standards under Title VII of the Civil Rights Act of 1964." *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316 (2004) (Smith, J., concurring); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277 (2d Cir. 2009); *Ludwig v. Rochester Psychiatric Ctr.*, 347 Fed. App'x 685, 686 n.1 (2d Cir. 2009) (Title VII and NYSHRL retaliation claims are "subject to the same analysis.")

Claims pursuant to New York City's human rights laws "have typically been treated as co-extensive with state and federal counterparts." *Loeffler*, 582 F.3d at 278.  "However, the New York City Council has rejected such equivalence."  *Id.* Pursuant to the Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 ("Restoration Act"), interpretations of New York state or federal statutes with similar wording may only be used "'to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall.'"  *Id.* (quoting Restoration Act § 1); *see also*

*Dybdal v. Variable Annuity Life Ins. Co.*, No. 06-CV-5686, 2007
U.S. Dist. LEXIS 85106, at *16-17 (E.D.N.Y. Nov. 19, 2007)
(citing *Pugliese v. Long Island R.R. Co.*, No. 01-CV-7174, 2006
U.S. Dist. LEXIS 66936, at *11-12 (E.D.N.Y. Sept. 19, 2006)
("Race discrimination claims brought under the New York City
Human Rights Law are reviewed under a more deferential
analytical framework than those brought under Title VII.")).
Because, however, a motion for summary judgment inquires only as
to whether a "rational factfinder could find in favor of the
non-moving party," as opposed to what the "floor" of a NYCHRL
claim may be, the court herein applies an identical analysis to
Plaintiff's Title VII, NYSHRL, and NYCHRL claims. *Graves v.
Finch Pruyn & Co.*, 353 Fed. App'x 558, 560 (2d Cir. 2009).

## II. Application

### A. Plaintiff's Discrimination Claim

Defendants assume, only for purposes of the instant
motion, that Plaintiff can establish a *prima facie* case of
discrimination. (ECF No. 48, Mem. of Law in Supp. of Defs.'
Mot. for Summ. J. ("Defs.' Mem.") at 5.) The only question with
regard to Plaintiff's discrimination claim, therefore, is
whether Defendants have articulated a legitimate, non-
discriminatory reason for terminating Plaintiff's employment.
The court finds that Defendants have done so.

### 1. Defendants Have Articulated a Legitimate, Non-Discriminatory Basis for Plaintiff's Termination

According to Defendants, Plaintiff was terminated for the legitimate and non-discriminatory reason that Plaintiff committed gross misconduct on August 12, 2008, by issuing the client mother manual checks for replacement cans of formula in the guise of increasing the package in knowing and deliberate contravention of WIC Program Manual Sections 1320 and 1330-B. (*See id*. at 5-6; Def.'s 56.1 ¶¶ 39-42, 44-49; Pl.'s 56.1 ¶¶ 39-42.) Plaintiff does not dispute that Defendants have articulated a legitimate, nondiscriminatory reason for terminating her employment. (*See* Pl.'s Opp. at 6-7.) Thus, the burden shifts back to Plaintiff to prove that Defendants' stated reason was a pretext for discrimination. *Ruiz*, 609 F.3d at 492.

### 2. Plaintiff Cannot Establish that Defendants' Basis for Her Termination was Pretextual

At this stage, the question becomes whether the evidence, taken as a whole and viewed in the light most favorable to Plaintiff, would permit "a rational finder of fact [to] conclude that the adverse action taken against [Plaintiff] was more likely than not a product of discriminatory animus." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 504 (2d Cir. 2009). Indeed, a defendant's stated neutral reason for an employment action "cannot be proved to be a 'pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that

discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).

The court may consider "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports [or undermines] the employer's case." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148-49 (2000)).

Plaintiff makes four arguments in support of finding that a genuine issue of material fact exists as to whether Defendants' basis for terminating Plaintiff was actually pretext for discrimination. (*See* Pl.'s Opp. at 6-7.) First, Plaintiff attempts to demonstrate pretext by comparing herself to her non-Caucasian former co-worker Bismonte, and by arguing that Plaintiff and Bismonte engaged in similar misconduct for which Bismonte was not terminated. (*Id.* at 8.) To prove that Defendants subjected her to disparate treatment, "that is, treated [her] less favorably than a similarly situated employee outside [her] protected group," Plaintiff must show that she "was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted); *see also Shumway v. United Parcel Serv., Inc.*, 118

F.3d 60, 64 (2d Cir. 1997) ("To be 'similarly situated,' the individuals with whom [plaintiff] attempts to compare herself must be similarly situated in all material respects." (citation omitted)). Employees are considered similarly situated if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham*, 230 F.3d at 40; *accord Finn v. N.Y. State Office of Mental Health*, No. 08-CV-5142, 2011 U.S. Dist. LEXIS 115950, at *40 (S.D.N.Y. Oct. 6, 2011) ("The court determines whether plaintiff and the asserted comparators are similar in significant respects by considering whether the respective individuals were subject to the same performance evaluation and disciplinary standards and engaged in conduct of comparable seriousness without any differentiating circumstances." (citing *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001))). The facts and circumstances of Plaintiff's and Bismonte's cases need not be identical, but there should be a reasonably close resemblance. *Graham*, 230 F.3d at 40.

Whether employees are similarly situated is "[o]rdinarily . . . a question of fact for the jury." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Nevertheless, if there are many distinguishing factors between plaintiff and the comparators, the court may conclude as a matter of law that they are not similarly situated. *McGuinness*

*v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001); *Harlen Assocs. v. Inc. Vill. of Minneola*, 273 F.3d at 499 n.2 (2d Cir. 2001) ("[T]his rule is not absolute . . . and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.").

Plaintiff argues that despite the fact that Bismonte, who, like Plaintiff, was authorized to issue WIC checks to clients, testified at her deposition that she had a habit of both over and under-issuing the proper amount of benefits to clients, (*See* Bismonte Dep. at 90-92, McCaffrey Decl. Ex. 1), "[n]o disciplinary action was taken against Ms. Bismonte, a native of the Philippines, but [Plaintiff], the sole Polish employee, was immediately taken to task," (Pl.'s Opp. at 8). Plaintiff also notes that she had no previous history of policy breaches, for over/under-issuance of checks or other policy breaches, in her approximately ten years of employment with the Bellevue WIC Program. (*Id.* at 7, 8.) The court's review of Bismonte's deposition indicates that she admitted to habitually under-issuing checks, and that rather than being terminated or otherwise disciplined for over or under-issuing WIC checks, she was instructed by her Bellevue supervisors to "[b]e more careful." (Bismonte Dep. at 93.) Bismonte also testified that she never replaced a check that was reported lost or stolen. (*Id.* at 25.)

Brandiss testified, however, that accidentally over/under-issuing checks due to changes in clients' benefit packages in the manner Bismonte did was "not a grave [] thing, because it could happen on a day-to-day basis. This was not something that . . . was consciously done." (Brandiss Dep. at 125, McCaffrey Decl. Ex. 3.) Celestino further testified that [e]ven the State recognizes that [over/under-issuing checks] is a very difficult thing to control. That's why they have to change it in the system." (Celestino Dep. at 164, McCaffrey Decl. Ex. 2.)

By contrast, Celestino testified that intentionally replacing lost or stolen checks as Plaintiff did is "a big thing . . . because it's one policy of the state where it--there is no gray area. Lost/stolen checks, no replacement whatsoever." (*Id.* at 91.) Additionally, whereas Bismonte testified that she was not aware of the fact that she was over/under-issuing checks until she was notified by Celestino and Brandiss, (Bismonte Dep. at 92), Plaintiff "admitted she was determined to increase the food package even if it meant going against policy and procedure." (Defs.' 56.1 ¶ 39.) Plaintiff's knowing and intentional commission of a serious violation of the WIC Program Manual precludes a reasonable jury from finding that Plaintiff was similarly situated to Bismonte and her accidental and less-serious violation of WIC policy. *See McGuinness*, 263 F.3d at

54. Accordingly, Plaintiff's first argument fails to establish that Plaintiff and Bismonte were similarly situated. Thus, Plaintiff has not established a genuine issue of material fact as to pretext.

Plaintiff's second argument is that a question of material fact remains as to whether she in fact issued "replacement checks" under the WIC Program Manual, and therefore whether she committed gross misconduct. (*See* Pl.'s Opp. at 9-14.) The court disagrees.

As an initial matter, Plaintiff correctly notes that "a negative arbitration decision rendered under a [collective bargaining agreement]," like the one Plaintiff received from the independent arbitrator, "does not preclude a Title VII action by a discharged employee." (*Id.* at 9-10 (quoting *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 (2d Cir. 2002)).) Plaintiff therefore argues that the independent arbitrator's decision and the other previous administrative decisions by HHC "are irrelevant" to this action. (*Id.* at 9.) Plaintiff's termination was finalized, however, after three stages of proceedings at which Plaintiff was represented by a union representative and/or counsel, and "only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination. This fact is highly probative of the absence

of discriminatory intent in that termination." *Collins*, 305

F.3d at 119. Furthermore, "[w]here, as here, that decision

follows an evidentiary hearing . . . , [Plaintiff], to survive a

motion for summary judgment, must present strong evidence that

the decision was wrong as a matter of fact . . . or that the

impartiality of the proceeding was somehow compromised." *Id.*

Because the record in this case contains the same evidence of

Plaintiff's gross misconduct that was presented to the neutral

arbitrator and HHC Labor Relations Officers, and because

Plaintiff has not offered any evidence or argument that would

impugn the impartiality of the neutral arbitrator, the court is

free to, and does, give substantial weight to the arbitrator's

decision. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60

n.21 (1974) (finding that determination of how much weight to

give a particular arbitration decision is left to district

court's discretion).

Plaintiff next argues that deposition testimony by

Plaintiff and Defendants illustrates that Plaintiff issued

manual checks, governed by Section 1320 of the Policy Manual,

rather than replacement checks, which is governed by Section

1330-B and is the basis on which Plaintiff was terminated by

HHC. (Pl.'s Opp. at 10.) To survive a motion for summary

judgment, however, Plaintiff must come forward with some

evidence that HHC's basis for terminating her was due to

unlawful discrimination, not merely that HHC's decision may have
been mistaken, inconsistent, unfair, or unjustified.  Moreover,
Plaintiff's bare argument that "the evidence supporting
Defendants' claim that Plaintiff issued replacement checks is
inconsistent and unconvincing" is insufficient to establish that
Defendants' reasons for terminating her were pretextual.  (Pl.'s
Opp. at 9.)  "It is well settled that the mere fact that an
employee disagrees with an employer's evaluation of that
employee's misconduct or deficient performance, or even has
evidence that the decision was objectively incorrect, does not
necessarily demonstrate, by itself, that the employer's
proffered reasons are a pretext for termination."  *Kalra v. HSBC
Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008); *see
also Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187
(E.D.N.Y. 2008) (noting that "evidence that the decision was . .
. based on a faulty investigation," without more, would be
insufficient to establish pretext); *McHenry v. One Beacon Ins.
Co.*, No. 03-CV-4916, 2005 U.S. Dist. LEXIS 46573, at *19
(E.D.N.Y. Aug. 29, 2005) ("A plaintiff's mere denial of
responsibility for the incidents giving rise to termination,
without more, is insufficient to defeat summary judgment."
(citing *Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 745-
47 (S.D.N.Y. 1996)); *Brown v. Soc'y for Seaman's Children*, 194
F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt

she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination."). Plaintiff points to nothing in the record to suggest that her termination for violation of WIC policies, whether Section 1320, 1330-B, or both, was in fact pretext for unlawful discrimination.

It also bears noting that regardless of whether Plaintiff is said to have issued replacement checks for lost or stolen checks or a manual increase of the mother's original food package, both actions are clearly proscribed by the WIC Program Manual. (*See* Section 1320, Andersen Decl. Ex. E, at OLR000170 (prohibiting the issuance of manual checks to make "food package changes"); Section 1330-B, *id.* at OLR000171 (limiting circumstances in which replacement checks may be issued).) Indeed, the neutral arbitrator discussed why Plaintiff's conduct with regard to the client mother was prohibited under both sections of the Program Manual. (*See* Arbitration Decision, Andersen Decl. Ex. M, at OLR000126-27.) Furthermore, Plaintiff does not dispute that the Step II Decision found that she did not document in her case notations that the client mother reported her checks lost, and that she was thus found to have "deliberately falsified the electronic record." (Def.'s 56.1 ¶ 42; Step II Decision at OLR000161; Pl.'s 56.1 ¶ 42.)

Accordingly, Plaintiff's second argument fails to illustrate a genuine issue of material fact as to pretext.

Third, Plaintiff argues that past instances in which Celestino would yell and scream at Plaintiff, tell Plaintiff that her accent bothered her, correct Plaintiff's English, and prohibit Plaintiff from speaking Polish at work, and in which Brandiss would also correct Plaintiff's English and, in 2007, stated to Plaintiff that "you think you're better because you're Polish, you think you're better because they're Spanish, you think you're better because you have a Master's degree," illustrate a question of fact as to Defendants' pretext for discrimination. (*See* Pl.'s Opp. at 14-17.) Once again, the court disagrees.

The making of racially charged and otherwise negative statements about a plaintiff's national origin by a supervisor can be grounds upon which a reasonable jury could find that an employer's proffered reason for termination of the plaintiff was pretextual. *See Richmond v. General Nutrition Ctrs., Inc.*, No. 08 Civ. 3577, 2011 U.S. Dist. LEXIS 67797, at *32 (S.D.N.Y. June 22, 2011). Plaintiff must, however, demonstrate the nexus between the alleged discriminatory comments and the adverse employment action. *See Vilien v. Dep't of Educ.*, No. 06 Civ. 3491, 2009 U.S. Dist. LEXIS 27468, at *12 (S.D.N.Y. Mar. 31, 2009) ("It is well established that stray remarks . . . without

a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment." (internal quotation marks omitted)). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (abrogated in part on other grounds); *see also Puglisi v. Town of Hempstead*, No. 10-CV-1928, 2012 U.S. Dist. LEXIS 133281, at *27 (E.D.N.Y. Sept. 17, 2012) (finding defendants' comments "isolated and too far removed from his demotion to establish causation"); *O'Connor v. Viacom Inc.*, No. 93 Civ. 2399, 1996 U.S. Dist. LEXIS 5289, at *13 (S.D.N.Y. Apr. 17, 1996) (same).

The court agrees with Defendants that the various statements by Celestino and Brandiss to Plaintiff are "isolated and too far removed from [her termination] to establish causation." *Puglisi*, 2012 U.S. Dist. LEXIS 133281, at *27. Indeed, most of the purported discriminatory comments about which Plaintiff complains occurred years prior to Plaintiff's termination, and prior to subsequent promotions of Plaintiff by Brandiss. (*See, e.g.*, Pl.'s Dep. at 58-59 (testifying that Celestino would sometimes scream at Plaintiff as early as when Plaintiff was an intern in 1997); *id.* at 67 (testifying about Brandiss correcting Plaintiff's English in 2002 or 2003); *id.* at

68-69 (testifying that Celestino told Plaintiff not to speak on the phone in Polish in front of a client sometime in 2006 or 2007).) Plaintiff also proffers no evidence that Celestino was the decision maker regarding her termination.

Further, while many of the statements by Brandiss and Celestino about which Plaintiff complains, which the court assumes are true for purposes of deciding the motion, are curt and abrasive, some of the comments are ambiguous with regard to Plaintiff's race and national origin. *See Kravtsov v. Town of Greenburgh*, No. 10-CV-3142, 2012 U.S. Dist. LEXIS 94819, at *48-49 (S.D.N.Y. July 9, 2012) (finding plaintiff's allegations about defendant's demeanor with regard to plaintiff's accent "conclusory and wholly subjective" (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir, 1997) ("[I]n the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."))); *see also Pasha v. William M. Mercer Consulting, Inc.*, No. 00 Civ. 8362, 2004 U.S. Dist. LEXIS 1226, at *14-16 (S.D.N.Y. Feb. 2, 2004) (finding occasional comments too isolated and ambiguous to support age discrimination claim). Brandiss's and Celestino's general complaints about Plaintiff's English and accent also pale in contrast to comments at issue in other actions, which courts have found support discrimination claims. *See, e.g., Richmond*, 2011 U.S. Dist. LEXIS 67797, at *8

31

(noting defendant told plaintiff "to 'Go back to Africa,' criticized his accent, and advised him he was being demoted because an African should not be in his position").

The court therefore finds that Plaintiff's third argument fails to illustrate a genuine issue of material fact as to pretext.

Fourth, Plaintiff attempts to present information about the demographic makeup of the Bellevue WIC Program during Plaintiff's tenure to illustrate an inference of discriminatory animus on the part of Defendants, particularly Celestino and Brandiss. (*See* Pl.'s Opp. at 17.) The last two purported facts included in Plaintiff's opposition to Defendants' Rule 56.1 statement concern the percentage of Filipino employees at the Bellevue WIC Program during Plaintiff's term of employment, (Pl.'s 56.1 ¶ 63), and the number of Caucasian employees at the program during the same time period, (*id.* ¶ 64). According to Plaintiff, "[t]he workforce at the WIC site has become overwhelmingly Filipino since [she] was first employed in 1997," which creates an inference of discrimination by Defendants. (Pl.'s Opp. at 17.)

The court first notes that Plaintiff fails to substantiate the accuracy of her demographic statistics by reference to any evidence in the record. Instead, Plaintiff cites to one of her four notarized affidavits in opposition to

summary judgment by Plaintiff herself. (*See* Pl.'s 56.1 ¶¶ 63-64 (citing ECF Nos. 53-1—53-4, Pl.'s Affs. 1-4 in Opp. to Summ. J.).) It is, however, hornbook law that "a self-serving affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude summary judgment." *United Magazine Co. v. Murdoch Magazines Distrib.*, 393 F. Supp. 2d 199, 211 (S.D.N.Y. 2005); *see also Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

Furthermore, assuming, *arguendo*, that Plaintiff's demographic numbers are accurate, the WIC Program staff's racial breakdown alone "does not make it more or less likely that [Defendants] discriminated against [Plaintiff] because of her race." *Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999) (finding statistical analysis that failed to account for major variables insufficient to support inference of discrimination); *see also Hollander v. American Cyanamid Co.*, 895 F.2d 80, 203 (2d Cir. 1990) (finding statistical report's "inference of [age] discrimination solely on the basis of the raw numbers is impermissible in the absence of any attempt to account for other causes of the . . . anomaly"); *Baron v. New York City Dep't of Educ.*, No. 06-CV-2816, 2009 U.S. Dist. LEXIS 57515, at *16 (E.D.N.Y. July 7, 2009) ("[S]tatistics alone are

insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she *in particular* has been discriminated against." (quotation marks omitted) (emphasis in original)).  Therefore, the court disregards Plaintiff's purported facts regarding the racial makeup of the Bellevue WIC Program during her tenure, and finds that Plaintiff has failed to thereby demonstrate discriminatory animus on the part of Defendants.[9]

In summary, because Plaintiff has failed to point to admissible evidence that would permit a rational trier of fact to conclude that her termination was more likely than not motivated by unlawful discriminatory animus based on her race and national origin, Defendants are entitled to summary judgment as a matter of law on Plaintiff's Title VII discrimination claims.  Further, because NYSHRL and NYCHRL discrimination claims are subject to the same or substantially similar analysis as retaliation claims under Title VII, for the reasons previously discussed, Defendants' motion for summary judgment on

---

[9] The court likewise disregards Plaintiff's assertion that Armesto's assistance to Plaintiff during her HHC Labor Relations hearings was deficient due to the Union Delegate's Filipino national origin and consideration by Brandiss for a supervisor position at the Bellevue WIC Program. (*See* Pl.'s Opp. at 10.)  Even assuming, *arguendo*, that Plaintiff's assertion is true, it is irrelevant to the court's determination of whether or not HHC's legitimate basis for terminating Plaintiff was in fact a pretext for discrimination, about which Plaintiff has failed to establish a question of fact.  *See Collins*, 305 F.3d at 119 ("[T]he tribunal received all the available evidence in an evenhanded proceeding and rendered a decision consistent with the almost overwhelming evidence of appellant's [fireable offense].").

Plaintiff's NYSHRL and NYCHRL discrimination claims is also

granted.  *See Ludwig*, 347 Fed. App'x at 686 n.1.

**B.   Plaintiff's Retaliation Claim**

    **1.   Plaintiff's Retaliation Claim is Reasonably
Related to the Discrimination Claims Asserted in
Her EEOC Complaint**

Plaintiff failed to include a claim of retaliation in

her original EEOC charge.  (*See* Charge of Discrimination,

Andersen Decl. Ex. O.)  Claims not raised in an EEOC complaint

may, however, still be brought in federal court if they are

"reasonably related" to the claims asserted in the EEOC

complaint.  *Mathirampuzha v. Potter*, 548 F.3d 70, 76-77 (2d Cir.

2008).  A claim not alleged in an EEOC complaint is considered

"reasonably related" if "'the conduct complained of would fall

within the scope of the EEOC investigation which can reasonably

be expected to grow out of the charge of discrimination.'"  *Id.*

at 76.  In determining whether claims are "reasonably related,"

courts conduct a "fact-intensive analysis" with the focus on

"the factual allegations made in the [EEOC] charge itself,

describing the discriminatory conduct about which a plaintiff is

grieving."  *Id*. (internal quotation marks omitted).  "'The

central question is whether the complaint filed with the [EEOC]

gave th[e] agency adequate notice to investigate discrimination

on both bases.'"  *Id.* at 77 (quoting *Williams v. New York City*

*Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006)).

"This 'reasonably related' exception to exhaustion is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims [he] is suffering." *Williams*, 458 F.3d at 70 (internal quotation marks omitted) (alteration in original). Furthermore, the Supreme Court has held that "[d]ocuments filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies." *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 406 (2008).

Additionally, a claim is deemed "reasonably related" to an EEOC complaint if the claim fell within the actual scope of the EEOC investigation arising from the complaint, as indicated in the EEOC decision. *See Dixit v. N.Y.C. Dept. of Gen. Serv.*, 972 F. Supp. 730, 733-34 (S.D.N.Y. 1997) (finding that national origin and religious discrimination claims were reasonably related to a retaliation claim where the EEOC decision specifically addressed all three categories of discrimination).

Although "retaliation and discrimination represent very different theories of liability," the court finds that Plaintiff's retaliation claims fall within the scope of her EEOC

discrimination investigation and complaint, that her retaliation claims are reasonably related to her discrimination claims, and that the EEOC and Defendants were put on notice of Plaintiff's retaliation claims. *Williams*, 458 F.3d at 71.

### 2. No Issues of Material Fact Exist Concerning Plaintiff's Retaliation Claim

A plaintiff's retaliation claim is examined applying the same *McDonnell Douglas* burden-shifting analysis used for disparate treatment claims. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003). A plaintiff makes a *prima facie* showing of retaliation by establishing "participation in a protected activity known to the defendant; an employment action disadvantaging the plaintiff; and a causal connection between the protected activity and the adverse employment action." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 (2d Cir. 1995)).

To meet this burden, a plaintiff may rely on evidence presented to establish her *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). "In determining whether this initial burden is satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to

determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrandt Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). Once a plaintiff has satisfied her *prima facie* burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. *See Feingold v. New York*, 366 F.3d 138, 157 (2d Cir. 2004). The burden then shifts back to plaintiff to demonstrate that the reasons proffered by defendant were a pretext for retaliatory animus based upon protected Title VII activity. *See King v. Interstate Brands Corp.*, No. 02-CV-6470, 2009 U.S. Dist. LEXIS 36594, at *50 (E.D.N.Y. Apr. 29, 2009) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)); *EEOC v. Thomas Dodge Corp.*, No. 07-CV-988, 2009 U.S. Dist. LEXIS 24838, at *38 (E.D.N.Y. Mar. 25, 2009).

The majority of retaliatory actions which Plaintiff alleges Defendants took against her are unsubstantiated by citation to any record evidence. (*See* Pl.'s Opp. at 15-17.) Rather, Plaintiff again exclusively cites to her own four self-serving affidavits. *See Hayes*, 84 F.3d at 619 ("Factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."). Therefore, these actions cannot be considered by the court.

The remaining purportedly retaliatory actions cited by Plaintiff are comments by Celestino and Brandiss at various times during Plaintiff's approximately ten-year tenure with HHC. (*See* Pl.'s Opp. at 15.) Claims of retaliation are, however, routinely dismissed when as few as three months elapse between the protected activity and the alleged act of retaliation. *See Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (citing with approval cases dismissing retaliation claims where adverse employment action followed protected activity by three to four months); *Hill v. Citibank Corp.*, 312 F. Supp. 2d 464 (S.D.N.Y. 2004); *Allen v. St. Cabrini Nursing Home, Inc.*, 198 F. Supp. 2d 442, 450 (S.D.N.Y. 2002) (citing *Hollander*, 895 F.2d at 84-85; *Nicastro v. Runyon*, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999)); *Ponticelli v. Zurich American Ins. Group*, 16 F. Supp. 2d 414, 435 (S.D.N.Y. 1998); *Zenni v. Hard Rock Cafe Int'l, Inc.*, 903 F. Supp. 644, 656 (S.D.N.Y. 1995)).

Here, Plaintiff's complaints to Celestino and Brandiss about Polish clients having to wait longer than other clients and Plaintiff's question of "do I have to go through all of this because I'm Polish," occurred in 2001, some seven years before the August 12, 2008, incident that resulted in her termination. Further, Plaintiff's January 31 and February 19, 2008, letters to Brandiss, in which she complains about Celestino's supervision, do not contain any references to race or national

origin, and were submitted nearly six months prior to the August 12, 2008, client incident and Plaintiff's subsequent suspension and termination. (*See generally* Andersen Decl. Ex. N.) These facts preclude Plaintiff from demonstrating that Defendants retaliated against her for complaining of discrimination. *See Hollander*, 895 F.2d at 85-86 (finding span of "several months" between protected activity and adverse employment action precludes temporal proximity sufficient to support retaliation claim); *Ragin v. E. Ramapo Cent. Sch. Dist.*, 2010 U.S. Dist. LEXIS 32576, at *74-75 (S.D.N.Y. Mar. 31, 2010) (noting that "many courts in this circuit have held that periods of two months or more defeat an inference of causation" and collecting cases); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation.")

    The court finds that Plaintiff has failed to raise a genuine issue of material fact with regard to her retaliation claims, and, therefore, that those claims must be dismissed.

## C. Plaintiff's §§ 1981 and 1983 Discrimination and Retaliation Claims Must be Dismissed

    Plaintiff additionally claims that Defendants violated her Fourteenth Amendment Equal Protection rights and has therefore alleged claims pursuant to 42 U.S.C. §§ 1981 and

1983.[10]  "Where, as here, a plaintiff's Title VII and equal

protection claims are predicated on the same allegations they

'must stand or fall together.'"  *Arroyo-Horne v. City of New*

*York*, No. 07-CV-5213, 2011 U.S. Dist. LEXIS 23904, at *29

(E.D.N.Y. Mar. 9, 2011) (quoting *Feingold*, 366 F.3d at 159); *see*

*also Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir.

2010) ("The substantive standards applicable to claims of

employment discrimination under Title VII . . . are also

generally applicable to claims of employment discrimination

brought under § 1981, the Equal Protection Clause, and the

NYSHRL.").  Therefore, for the reasons discussed *supra*,

Plaintiff's Section 1981 and 1983 claims are dismissed.

### D.  Plaintiff's § 1985 Conspiracy Claims Against the Individual Defendants Must be Dismissed

Plaintiff alleges pursuant to 42 U.S.C. § 1985 that

Celestino, Brandiss, and Bismonte conspired to deprive Plaintiff

of her Fourteenth Amendment Equal Protection rights.  (*See* Am.

Compl. ¶¶ 94-97.)  "To survive summary judgment on a § 198[5]

conspiracy claim, [Plaintiff] must show (1) an agreement between

. . . a state actor and a private entity; (2) to act in concert

to inflict an unconstitutional injury; and (3) an overt act done

---

[10] Contrary to Plaintiff's allegation that Defendants "have violated and continue to violate 42 U.S.C. § 1981, 1981(a) and 1983," (Am. Compl. ¶ 61), Sections 1981 and 1983 are "'not [themselves] a source of substantive rights, but merely provide[] a method for vindicating federal rights elsewhere conferred,'" *Romero v. City of New York*, 839 F. Supp. 2d 588, 617 (E.D.N.Y. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).

in furtherance of that goal causing damages." *Ostensen v. Suffolk County*, 236 Fed. App'x 651, 653 (2d Cir. 2007) (internal quotations marks omitted). Because, as discussed *supra*, Plaintiff has failed to allege facts sufficient to demonstrate that her constitutional rights have been violated, Plaintiff's Section 1985 conspiracy claims must be dismissed. Plaintiff's constitutional conspiracy claims would additionally be dismissed for the reason that where, as in this case, "the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment," there is no conspiracy. *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *see also Straker v. N.Y. City Transit Auth.*, 340 Fed. App'x 675, 677 (2d Cir. 2009).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in its entirety. The Clerk of the Court is respectfully directed to enter judgment in favor of Defendants and close this case.

**SO ORDERED.**

Dated:  Brooklyn, New York
        September 25, 2013

                                    _____/s/_____
                                    KIYO A. MATSUMOTO
                                    United States District Judge

42